IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JEAN-ROBERT CADET,                     :          CASE NO.   C-1-01-131

             Plaintiff,                :          MAGISTRATE JUDGE HOGAN

v.                                     :

                                       :

MADEIRA CITY SCHOOL DISTRICT, et al.   :

             Defendants.               :

                                       :

JOINT FINAL PRETRIAL ORDER

This matter came before the Court at a Final Pretrial Conference held on September 5,

2003, at 2 P.M., pursuant to Fed. R. Civ. P. 16.

I.    APPEARANCES:

      For Plaintiff:        W. Kelly Lundrigan
                            Rhonda S. Frey
                            Mackenzie L. Becker

      For Defendants:       R. Gary Winters
                            Bernard W. Wharton

II.   NATURE OF ACTION AND JURISDICTION

This is an action for claims of racial discrimination, disparate treatment, retaliation,

intentional infliction of emotional distress, and violation of public policy.

The jurisdiction of the Court is invoked under Title 42 United States Code 1981, 1983,

1985, and 1988.

The jurisdiction of the Court is not disputed.

The parties have consented to entry of final judgment by the United States

1

Magistrate Judge.

**III.    TRIAL INFORMATION**

      1.     The estimated length of trial is 4-5 days.

      2.     Trial to a jury will begin on October 6, 2003.

      3.     Initial Explanation of the Case:

**PLAINTIFF:**

Plaintiff Jean-Robert Cadet is a teacher. Defendant Hummel is the superintendent of Madeira City Schools. Defendant Mate is the principal at Madeira Junior-Senior High School. Defendant Imhoff was formerly the assistant principal at Madeira Junior-Senior High School and is now assistant superintendent for Madeira City School District. Plaintiff was hired part-time in 1996 and full-time in 1997 and was the only black teacher at Madeira Junior-Senior High School. Madeira Junior-Senior High School has approximately 700 students, less than 10 of whom are of a racial/ethnic minority.

Students at Madeira Junior-Senior High School racially harassed Plaintiff. Plaintiff reported the harassment to the administration, but the administration failed to take appropriate steps to eliminate the harassment. Instead, the administration informed Plaintiff that they had received complaints about Plaintiff from which they concluded that he had problems with classroom management and consistency in dealing with students. In February, 2000, the administration presented Plaintiff with an ultimatum of accepting a mentor or resigning.

The administration also treated Plaintiff less favorably than similarly-situated white teachers. In April, 1999, another teacher resigned, and Plaintiff and two other teachers volunteered to give up their planning period to cover that teachers classes for the remainder of

the school year. Each teacher at Madeira has only one planning period per day. The administration agreed to compensate the other two teachers in addition to their regular salary, but refused to pay Plaintiff. The other two teachers are white.

The administration also responded differently to the complaints about Plaintiff than they did to complaints about other (white) teachers. Plaintiff was never even given the names of those individuals who allegedly complained about him or the details of their complaints, though he requested that information. The administration treated Rick Schneider, a white Spanish teacher, differently. The administration received complaints from three out of the four students in Mr. Schneiders Spanish AP class and their parents, and the students eventually transferred out of the class. They accused Mr. Schneider of having poor rapport with his students and of talking down to them. Defendant Mate scheduled a meeting between Mr. Schneider and two of the parents to attempt to resolve the issue. Following the meeting, Defendant Mate supported the parents accusations and told Mr. Schneider to re-examine his evaluation procedures. At no time, however, was the assignment of a mentor for Mr. Schneider ever discussed, nor was he disciplined in any way.

As a result of the way he was treated at Madeira Junior-Senior High School, Plaintiff felt compelled to resign on February 25, 2000. Plaintiff subsequently sought employment as a teacher at numerous other schools but has not, to date, been hired. He had an interview during the summer of 2001 in which the school district requested a reference from Madeira. A request for the reference was made, but a reference was never provided. Plaintiff did not get the job.

Since leaving Madeira, Plaintiff has been teaching French part-time at Raymond Walters College, occasionally consulting for the United Nations or UNICEF, working on having his book

3

published in other countries and on writing a sequel, and assisting with television documentaries about child slavery in Haiti. He receives royalties from his book and a modest income from his other activities.

**DEFENDANTS:**

The plaintiff is a black man of Haitian descent who began working for defendant Madeira City School District Board of Education as a part-time teacher in September of 1996 and was hired as a full-time French and history teacher beginning in September 1of 1997. He is married to a white woman who is also a teacher at Madeira Junior/Senior High School and they have a son who attends school in Madeira as does his wifes daughter from a prior marriage. The principal at Madeira Junior/Senior High School was Chris Mate and the assistant principal was Paul Imhoff. Dr. Michele Hummel is the superintendent. The plaintiff had a series of limited contracts as a teacher but did not have a continuing contract.

Plaintiff resigned from Madeira effective February 25, 2000. At that time, the superintendent asked him to reconsider and wanted him to stay. Plaintiffs wife also advised him not to resign. This resignation violated his contract with Madeira and he left the school district without anyone immediately available to cover his classes.

Prior to the plaintiffs resignation, there were several parents and students who complained about him and asked that he no longer teach the students. These complaints concerned the plaintiffs classroom management, his failure to treat the students with respect, and inconsistent discipline. Some of these complaints came from female students who were uncomfortable with his actions and teaching methods in French class. In response to these complaints, Mr. Mate met with Plaintiff at the beginning of the 1999-2000 school year to talk

4

about these concerns as issues for the plaintiff to address in his target goals in the up-coming year.  Plaintiff had several meetings during the school year with Mr. Imhoff and Mr. Mate to discuss parent complaints and treating the students with respect.

On February 18, 2000, Mr. Imhoff and Mr. Mate collaborated on a memo to Plaintiff concerning his job performance and informed him of the need to accept the assignment of a mentor or to resign at the end of the school year.  Plaintiffs wife felt that the administrations desire for her husband to have a mentor was motivated by sincere educational reasons.  The memo discussed the concerns about Plaintiffs job concerns that had been raised by Mr. Mate at the beginning of the school year and expressed the defendants desire that Plaintiff choose the mentor approach and be successful in the Madeira School District.  Plaintiff was unwilling to have a mentor assigned to him.

Plaintiff has made claims of racial harassment, manifested by racial slurs written on his blackboard in his classroom and racial insults from students.  The first time the racial slurs appeared on his blackboard were in October of 1999.  Nobody has ever told Plaintiff that they witnessed somebody writing these slurs on his blackboard.  This happened two or three times before he decided to inform any of the defendants.  He did so first in a meeting with Mr. Imhoff and Mr. Mate in November of 1999.  Before that November 1999 meeting, Plaintiff had never made any mention of any racially insensitive, derogatory or hostile conduct towards him in Madeira.  Plaintiff testified that he does not remember telling his wife, who is also a department chair, about these slurs on his blackboard.  Plaintiff admitted that he did not show the racial slurs to anyone, that he destroyed the evidence by erasing the writings before any of the defendants could see them, and he did not show them to his wife even though she was his department chair

working in the same building as he did. Defendants investigated several suspects for writing these slurs but could not verify who had done it. Mr. Imhoff and Mr. Mate told Plaintiff that these slurs were intolerable and unacceptable to the defendants and asked Plaintiff to let them kn ow if it happened again so they could preserve the evidence and find out who was doing it. Despite this direction, Plaintiff never reported any later instances to the administration, erased all the evidence, and never showed the writings to anyone.

After Plaintiff resigned, he reported to the superintendent that someone had left a racist message on his voice mail at school. He told her that he had received other calls both at home and at his voice mail at school. He did not know who was calling and leaving these racist messages. He did not save any of these eight to twelve messages he had received except for the last one received after he had resigned. He did tell a fellow teacher about them before he told the administration and that teacher advised him to save the messages and tell the administration. Plaintiff did not follow that advice. Once Plaintiff told Defendants of the calls, the school administration called the Madeira Police Department and the Federal Bureau of Investigation as part of its attempt to investigate. The investigation resulted in the determination that the call was untraceable. There was no evidence as to where these messages originated or whether they were left by anyone connected to the Madeira school system.

**IV.    AGREED STATEMENT AND LISTS:**

    **1.    PLAINTIFFS CLAIMS:**

        **Plaintiff asserts in Counts I and IV a right of recovery for Harassment/Hostile Environment as follows:**

Plaintiff is a black man of Haitian descent, and thus a member of a protected class. Plaintiff was subject to unwelcome harassment when students uttered racial epithets, wrote racial comments on his blackboard and left racially derogatory voice mail messages. The harassment contained racially derogatory language and was clearly based on race. The harassment unreasonably interfered with Plaintiffs work, as he was frightened of one student and felt extremely uneasy around others. As his employer, Defendants knew or should have known about this harassment but failed to take prompt and appropriate action.

**Plaintiff asserts in Count II and V a right of recovery for Defendants Discrimination/Disparate Treatment as follows:**

Plaintiff is a member of a protected class, with qualifications including teaching certification, a Masters degree, a professional certificate, and 8 years prior teaching experience. Plaintiff was subject to an adverse employment action when he was constructively discharged. He was subjected to harassment and disparate treatment that made working conditions so intolerable that a reasonable person would feel compelled to resign. Plaintiff was treated less favorably than similarly-situated persons outside his protected class when two white teachers were paid for giving up their planning period while Plaintiff was not.

Additionally, complaints about a white teacher were handled differently than alleged complaints about Plaintiff. One of the white teachers classes circulated a petition against him; and three of four students in another of his classes and their parents complained about him and dropped his class, claiming he had poor rapport with the students. Unlike Plaintiff, the white teacher was provided with the names of the complainants and specific information about the complaints. Plaintiff asked who had complained about him and requested information about the nature of the complaints, but Defendants refused to provide the information. The white teacher

7

was permitted to meet with the complainants to attempt to resolve the situation and was not assigned a mentor or disciplined in any way.  Plaintiff was denied any opportunity to respond to the complaints but was given the ultimatum of accepting a mentor or resigning.

**Plaintiff asserts in Counts III and VI a right of recovery for Defendants Retaliation as follows:**

Plaintiff was engaged in protected activity when he reported racial harassment to Defendants.  Defendants knew Plaintiff was exercising his civil rights, as they knew the details of the harassment.  Defendants thereafter retaliated against Plaintiff.  Two months after Plaintiff first reported the racial harassment, Defendants gave Plaintiff a  poor performance evaluation while all previous evaluations had been excellent.  Three months after his first report of racial harassment, Defendants gave Plaintiff an ultimatum to accept a mentor or resign.  A causal connection exists between Plaintiffs protected activity and Defendants adverse employment action in the timing, Defendants lack of appropriate response to Plaintiffs reports of harassment, and their  refusal to provide information about the alleged complaints against Plaintiff.

**Plaintiff asserts in Counts II and V violations of  1981 and 1983 as follows:**

Defendants as individuals violated Plaintiffs rights by refusing to compensate him as the white teachers were compensated, and by treating complaints against him differently than complaints against white teacher.  Madeira City Schools Board of Education ratified the decision to pay the white teachers but not Plaintiff.

**Plaintiff asserts in Count X a right of recovery for Intentional Infliction of Emotional Distress as follows:**

8

Defendants conduct was extreme and outrageous when they refused to confront the racial issues that Plaintiff was encountering.   As a result of Defendants conduct, Plaintiff suffered severe emotional distress, including hopelessness and depression requiring medication.

**Plaintiff asserts in Count IX a violation of Public Policy as follows:**

There is a clear public policy against racial discrimination.  No other black teachers were employed by Madeira, and few black students attended Madeira Junior-Senior High School. Defendants refusal to address racial issues essentially condoned discrimination and thus violated public policy.  No overriding business justification exists for Defendants actions.

2.    **DEFENDANTS CLAIMS:**

1. Plaintiff began working for defendant Madeira City School District Board of Education as a parttime teacher in September 1996 and was hired as a fulltime French and history teacher for the Madeira Junior/Senior High School beginning in September 1997.

2. Plaintiff is a black man of Haitian descent.

3. The Principal of Madeira Junior/Senior High School was Chris Mate and the Assistant Principal was Paul Imhoff.

4. Plaintiff is married to a white woman who is also a teacher at Madeira Junior/Senior High School and who served as his departments chair.

5. Plaintiff and his wife have a son who attends school in Madeira and his wife has a daughter from a prior marriage who is also a student in the District.

6. Plaintiff resigned from Madeira City School District effective February 25, 2000.  At the time plaintiff resigned, the Superintendent, Dr. Michele Hummel, ask him to reconsider and wanted him to stay.   Plaintiffs wife also advised him not to resign.  His resignation

9

violated his contract and left Madeira without anyone immediately available to cover his classes.

7.  The first time plaintiff claims to have seen a racial slur written on his blackboard was in late October of 1999.  According to plaintiff, there were allegedly several racial slurs written on his blackboard at least six to eight times.  The racial slurs appeared on is blackboard two or three times before he decided to inform any of the defendants.  He did so first at a meeting with Mr. Imhoff and Mr. Mate in November of 1999.

8.  Before that November 1999 meeting, plaintiff had never made a complaint of any racially insensitive, derogatory or hostile conduct towards him at Madeira.  Plaintiff does not remember telling his wife about these slurs.  Plaintiff admitted that he did not show these slurs to anyone, that he destroyed the evidence by erasing the writings before any of the defendants could see them, and he did not show them to his wife, even though she was his department chair and worked in the same building.  When plaintiff told Mr. Imhoff and Mr. Mate about the slurs on his blackboard, they told him to keep his door locked when he was out of the room; but he did not always follow their instructions.  Mr. Imhoff told plaintiff that these slurs were intolerable and unacceptable to the defendants and asked plaintiff to let them know if they happened again so they could preserve the evidence and get to the bottom of who was doing it.

9.  Plaintiff also testified about several insults by students, some of which were racial.  These started in October of 1999.  Some of the students had disciplinary issues with plaintiff.

10. Plaintiff related to the defendants that he was getting annoying and racially harassing

phone calls.  Once plaintiff told defendants of the calls, the administration called the

Madeira Police Department and the Federal Bureau of Investigation as part of their

attempts to investigate.  The investigation resulted in determination that the one call

saved by plaintiff was untraceable.   There is no evidence as to where these messages

originated or that they were left by anyone connected to the Madeira school system.


3.    **UNCONTROVERTED FACTS:**

**The following facts are established by admissions in the pleadings or by stipulations of counsel:**

i)   Plaintiff is a black man of Haitian descent.

ii)  Plaintiff began working for Defendant Madeira City School District Board of

Education as a part-time teacher in September 1996.  He was hired as a full-time

French and history teacher for the Madeira Junior/Senior High School beginning in

September of 1997.

iii) Defendant Chris Mate was the principal of Madeira Junior/Senior High School.  Paul

Imhoff was the assistant principal.

iv)  Plaintiff resigned from Madeira effective February 25, 2000.  Plaintiffs resignation

violated his contract with Madeira.

v)   The first time Plaintiff claims to have seen a racial slur written on his blackboard was

in late October of 1999.  It said, "Go back to Africa, nigger."  According to Plaintiff,

there were allegedly similar racial slurs written on Plaintiffs blackboard at least six to

eight times.  The letters of the racial slurs on the blackboard were approximately five

to six inches high.

11

vi) The racial slurs appeared on Plaintiffs blackboard two or three times before he decided to inform any of the defendants. He first did so in a meeting with Imhoff and Mate in November, 1999. Plaintiff did not show the slurs to anyone and he erased the writings before any of the defendants could see them. He did not show the slurs to his wife, who was his department chair.

vii) Before the November 1999 meeting, Plaintiff had never made a complaint of any racially insensitive, derogatory or hostile conduct towards him at Madeira.

viii)    When Plaintiff told Imhoff and Mate about the slurs on his blackboard, they told him to keep his door locked when he was out of the room, but he did not always follow their instruction.

ix) Imhoff testified that he and Mate told Plaintiff that the slurs were intolerable and unacceptable to the defendants and asked Plaintiff to tell them if it happened again so that they could preserve the evidence and get to the bottom of who was making the slurs.

x) Plaintiff also testified as to several insults by students, some of which were racial. One such incident occurred in October of 1999 and involved Nick Schuck, a student. Schuck came up behind Plaintiff on his way out of class and said, "Why dont you go back to Africa." Plaintiff does not know whether anyone else heard Schuck say this.

xi) At some point, Plaintiff told Defendants about certain phone calls he had been receiving which apparently were racially derogatory. After he told defendants about the calls, the administration called the Madeira Police Department and the Federal

Bureau of Investigation as part of its attempt to investigate. The investigation resulted in the determination that "the call" was untraceable.

4.    **ISSUES OF FACT AND LAW:**

    a.    **CONTESTED ISSUES OF FACT:**

        **Plaintiffs Facts:**

i)   A former child slave, or restavec, in Haiti, he was the only black teacher at Madeira Junior-Senior High School.

ii)  To apply for continuing contract status, a teacher must teach three out of the last five years in Madeira School District and possess a Masters degree and professional certification.

iii) Plaintiff earned a Masters degree in French Literature in 1994 and holds a professional certificate.

iv)  Prior to being hired by Madeira, Plaintiff had eight years of previous teaching experience.

v)   During the time that Plaintiff taught at Madeira, he was the only black teacher hired or even interviewed for a teaching position at MJSHS.

vi)  Of the approximately 730 students who currently attend MJSHS, less than ten are African American and less than fifteen are other racial minorities.

vii) Cindy Cadet, Plaintiffs wife, who has taught at MJSHS for 14 years, testified that she informed Mate and Imhoff that Plaintiffs race was an issue for students at MJSHS

13

because they never had any interaction with anyone of color, especially in a position of authority.

viii)    Up until October or November of 1999, Madeira City Schools didnt even have a policy prohibiting racial harassment.

ix) Plaintiff first reported to the administration at MJSHS in October or November of 1999 that he was experiencing racial harassment.

x)   At that time, Plaintiff informed Defendants Mate and Imhoff that Nick Schuck had told him to "go back to Africa" and that "go back to Africa, nigger" had been written on the blackboard in his room.  Defendant Mate, however, denies that Plaintiff told him and Imhoff about Schucks "go back to Africa" comments.

xi) During the same meeting, Plaintiff also informed Defendants Mate and Imhoff that Ben Kallgren had called him "nigger."  Prior to reporting that incident, Plaintiff had attempted to resolve the issue by contacting Kallgrens mother, but received no support from her.  When Plaintiff told Ben Kallgren that he was going to call his mother, Kallgren told him not to bother because his mother hates black people.

xii) Ben Kallgren continued to harass Plaintiff by blocking the door to his classroom and making threatening remarks to him.

xiii)    When Kallgren threatened Plaintiff on a Sunday at the Madeira Kroger store, he reported the incident the next day in writing to Defendant Imhoff, but no disciplinary action was taken against Kallgren.  Likewise, Plaintiff reported to Imhoff the incidences when Kallgren blocked the door to his classroom.  Kallgren remained in

14

xx) Plaintiff further testified that in his conversation with Defendants Mate and Imhoff, Imhoff asked why Ms. Vaccari would lie, and why the two students who corroborated her story would lie when they were straight A students. Plaintiff emphasized the absurdity of Defendants Mate and Imhoffs belief that he would make such a statement by reminding them that he has a son who is half-black.

xxi)    Defendant Mate told Plaintiff he would take drastic action if such an incident was repeated.

xxii)    During the 1998-99 school year, Nick McQuery exploded a stink bomb in Plaintiffs class and admitted to Plaintiff that he had done it. Plaintiff wrote a discipline referral but no action was taken against McQuery because he denied to Defendant Imhoff that he had set off the stink bomb. McQuery made racial comments to Plaintiff as well.

xxiii)    Another such incident in which Defendants chose to disbelieve Plaintiff occurred when Plaintiff submitted a discipline referral reporting that Christopher Wallace had directed profanity at him. Because Wallace denied the accusation and other students backed him up, Defendant Imhoff concluded that he had not used profanity and should not be disciplined.

xxiv)    Defendant Imhoff cited, in a statement to the Ohio Civil Rights Commission, Ohio Revised Code Section 3313.66 as prohibiting the administration from disciplining a student in the absence of clear evidence that the acts for which they were being disciplined actually occurred. However, when questioned during his

deposition, Defendant Imhoff could not recall ever reading the statute or how he reached that conclusion. He also could not recall making the statement to the OCRC.

xxv)    In a memorandum dated February 18, 2000, Defendant Imhoff gave Plaintiff an ultimatum of accepting a mentor or submitting his resignation, citing the administrations concerns with Plaintiffs "effective classroom management strategies" and "consistency in dealing with students." Defendant Imhoff admitted, however, that no details of any incidences that led to those conclusions were ever documented.

xxvi)   Defendant Mate admitted that neither ineffective classroom management nor inconsistency in dealing with students were ever mentioned in any of Plaintiffs performance evaluations prior to December 1999, approximately one month after Plaintiff first reported to Defendants Mate and Imhoff that he was being racially harassed. Prior to that time Plaintiff had, in fact, been complimented in performance appraisals specifically with regard to his effective classroom management strategies and his rapport with students.

xxvii)  The performance evaluations contained in Plaintiffs file indicate that Plaintiff attempted to teach students in his French classes words that they would use in everyday life. Mate testified that he found that approach appropriate.

xxviii) In Spring 1998, several students in Plaintiffs French III class complained about him teaching the words "douche" and "tampon" which, in French, mean "shower" and "cloth," respectively. Former Principal Martin Strifler recalls that those were the only complaints he ever received about Plaintiff.

17

xxix)   One parent went so far as to accuse Plaintiff in a letter to the Superintendent of harassment with regard to the "douche/tampon" incident.   That same parent admittedly contacted parents of other students in Plaintiffs French III class to inform them of what she deemed inappropriate conduct by Plaintiff.  In that same letter, the parent related her conversations with other parents who voiced their intent to "bring the district to its knees" over the incident.

xxx)   Defendant Mate testified that Plaintiff was expected to stop saying "douche" and "tampon" aloud after the students asked him to stop.

xxxi)   Defendant Mate further testified that he is unaware whether the current French teachers teach those words and that he has not instructed them not to teach those specific words.

xxxii)  The word "douche" appears in the French III textbook and is the subject of a skit. And Plaintiff was, at the time of the incident, preparing his students for a trip to France.

xxxiii) As a result of the complaints, Plaintiffs French III class was taken from him, given to his wife, and he was required to teach a French I class instead.

xxxiv) In September 1999, Defendant Mate called Plaintiff to a meeting and informed him that sixteen parents had called over the summer to complain about him.   When Plaintiff asked who had complained, the administration refused to tell him. They also refused to inform him of the specific nature of the complaints.  Instead, Defendant Mate simply stated that Plaintiff had problems with "classroom management, inappropriate comments that some female students found uncomfortable, consistent

rules and fair treatment of students." Plaintiff never obtained more information from the administration as to the specific complaints or the individuals who complained.

xxxv) After Plaintiff resigned, Defendant Mate compiled a list of "parents and/or students who complained about Jean Cadet or requested that their child be removed from his class." Of the twelve names that appeared on that list, four of those students (Wallace, Holland, Schuck and Kallgren) were consistent discipline problems not only for Plaintiff but for other teachers as well. At least three others were students or parents who complained about Plaintiff teaching the words "douche" and "tampon." Another (Johnston) was an habitual complainer whose complaints former principal Strifler found not to be legitimate. Still another student (Gunther) was unhappy with her grade in Plaintiffs class but, when questioned by Defendant Mate, Plaintiff provided a satisfactory explanation for the students grade. Defendant Mate admitted that he solicited written complaints from two of the students (Wallace and Beyersdorfer).

xxxvi) Defendant Mate admitted that he did not share with Plaintiff the names of the individuals on the list nor did he explain their specific complaints.

xxxvii) Defendant Mate also testified that if a parent requested that their child not be placed in Mr. Cadets class, he simply attempted to accommodate that request without requesting an explanation;  so, for all he knew, they could have made the request because Plaintiff is black.

xxxviii)    When Meredith Massey resigned in the Spring of 1998, Plaintiff and two Caucasian teachers -- Kay Fluharty and Rick Schneider -- each offered to give up their only planning period to help cover Mr. Masseys classes.

xxxix) Defendants emphasize that Plaintiff "volunteered" to help out; but Mr. Schneider verified that he and Ms. Fluharty also "volunteered" to teach Mr. Masseys classes.

xl) Madeira paid the two Caucasian teachers compensation in addition to their salary but refused to pay Plaintiff.

xli) Kay Fluharty stated that it was her understanding that the Madeira teachers contract requires that each teacher have one planning period per day; and when she agreed to relinquish her planning period, she expected to be paid an additional one-seventh of the amount of her salary because she would be teaching all seven periods each day. Rick Schneider likewise understood that he was being paid additional compensation because he was giving up his planning period.

xlii)    Defendants attempt to defend their action by arguing that Ms. Fluharty and Mr. Schneider were required to spend more time than Plaintiff to prepare for the classes they took over. However, Defendant Mate admitted that he had no idea as to how much time Plaintiff spent preparing to teach his class, whether he devoted evening hours for preparation, whether Plaintiff gave tests, quizzes or homework, or spent time outside of class grading that work.

xliii)   Plaintiff testified that he prepared lesson plans, assigned and graded homework, and gave and graded tests for the class that he took over from Mr. Massey.

xliv)   Mr. Schneider also testified that students and parents have complained about him to the administration and that students circulated a petition against him that was presented to the administration.

xlv)   During the 2001-2002 school year, three out of the four students in Mr. Schneiders Spanish AP class complained about him to the principal.  In response, Defendant Mate scheduled a meeting with Mr. Schneider and two of the students parents to discuss the perceived problems.  One parent accused Mr. Schneider of having poor rapport with the students and of talking down to them.  Though one of the parents became rather vicious, Defendant Mate failed to defend Mr. Schneider in any way.  Instead, he supported the parents accusations and suggested that Mr. Schneider re-examine his evaluation procedures.  At no time, however, was the assignment of a mentor ever even mentioned.

xlvi)   Most of the teachers who have been assigned mentors have been in their first years of teaching.

xlvii)   Mr. Schneider stated that complaints from parents are common at MJSHS and that, in his opinion and the opinion of other teachers, public relations and pleasing the parents in the community are more important than defending a teacher.  Former principal Strifler agreed that Madeira City School District believes in parent input and in letting them have a voice.

xlviii)   One of the few black students at MJSHS was also the target of racial taunts. Former student Caldwell Wright spoke with administrators about racially derogatory

comments made to him. The consistent response from the administration was to tell the students to "stop name-calling."

xlix)    Defendant Mate testified that he met with Mr. Wright in early 2000 specifically to ask whether Mr. Wright felt that racial harassment was occurring at MJSHS. Mr. Wright testified that he told Defendant Mate at that time about the instances of harassment that he had previously reported.

l)    Defendant Mate claimed that Mr. Wright told him that he thought that Plaintiffs characterization of MJSHS was unfair and incorrect, but Mr. Wright vehemently denied ever making such a statement.

**b.    Defendants Facts:**

**5.        CONTESTED ISSUES OF LAW:**

**Plaintiffs Issues of Law:**

A.    To constitute constructive discharge, an employer must "deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." Moore v. Kuka Welding Systems, 171 F.3d 1073, 1080 (6th Cir. 1999). The employers intent and the employees objective feelings must be examined. Intent may be presumed if quitting was a foreseeable consequence of the employers actions. Id. A hostile work environment is considered a factor that may cause constructive discharge. Id.

B.    Plaintiff was constructively discharged from his employment at MJSHS. Defendants fostered a racially hostile environment by refusing to acknowledge and confront the

22

racial issues that they knew or should have known existed. Instead they chose to disbelieve Plaintiff when he reported instances of harassment. They refused to punish those who racially harassed Plaintiff and they, themselves, engaged in disparate treatment of Plaintiff.

C.    In February, 2000, Defendants issued Plaintiff a memorandum giving him an ultimatum of either accepting a mentor or submitting his resignation. Defendants knew that, to a teacher like Plaintiff with ten years of experience, the assignment of a mentor was degrading and demoralizing. Considering the effect of the memorandum itself, coupled with the lack of support the administration offered with regard to the harassment he was experiencing and Defendants disparate treatment of him, Plaintiffs resignation was clearly a foreseeable consequence of issuing the memorandum. Defendants intent to create intolerable working conditions to force Plaintiff to resign may therefore be inferred, and the conclusion can be drawn that he was constructively discharged.

D.    In order to prove a hostile work environment, a plaintiff must show that:  1)  he belongs to a protected group;  2) he was the subject of unwelcome harassment;  3)  the harassment was based on race;  4)  the harassment affected a term, condition or privilege of his employment;  and 5)  the defendant knew or should have known about the harassment and failed to take action. Moore v. Kuka Welding Systems, 171 F.3d 1073, 1080 (6th Cir. 1999). Any action taken by an employer must be prompt, appropriate and "reasonably calculated to end the harassment." Blankenship v. Parke Care Centers, Inc., 123 F.3d 868, 872 (6th Cir. 1997), quoting Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983).

E.    In considering whether a reasonable person would consider an environment hostile or abusive, a court must consider all of the circumstances including frequency, severity,

whether the conduct is threatening or humiliating, and whether it unreasonably interfered with the employees work performance. Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999).

F.      Plaintiff is black, a native of Haiti and is therefore indisputably a member of a protected class. He was the victim of racial harassment and discrimination while employed as a teacher at MJSHS. The administration engaged in the disparate treatment of Plaintiff and was aware of the harassment but failed to properly address the problem. As a result, Plaintiff was forced to resign when he was no longer able to tolerate the conditions under which he was compelled to try to do his job.

G.      Defendants were aware of the racial hostility at MJSHS but chose to ignore the problem. Defendants claim in their Memorandum that "there was not much more that could be done" except to tell Plaintiff to lock the door to his classroom so that racially derogatory messages could not be written on his board. Defendants took no other action "reasonably calculated to end the harassment." See Blankenship, 123 F.3d at 872. However, after Plaintiff resigned and spoke with the media about how he had been treated, Defendants wasted no time in calling an assembly to talk about the schools harassment policy.

H.      Considering all of the circumstances in this case, the environment at MJSHS was certainly one that a reasonable person would find hostile and abusive. See Hafford, 185 F.3d at 512. Defendants fostered that environment, undermined Plaintiffs authority and discriminated against him to the point that it became intolerable for him to continue teaching at MJSHS.

I.      To establish a prima facie case of disparate treatment, a plaintiff must prove that: 1) he is a member of a protected class; and 2) he was treated less favorably than a similarly situated non-minority employee. Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992).

24

J.      Plaintiff, Kay Fluharty and Rick Schneider were certainly similarly situated, in that they were all full-time teachers at MJSHS who, prior to Mr. Masseys resignation, each had one planning period per day.  They all volunteered to give up their planning period to assist in covering Mr. Masseys classes and all spent extra time preparing to teach their classes and grading students work.  The difference was Ms. Fluharty and Mr. Schneider are white and Plaintiff is black; and they were paid and Plaintiff was not.  Plaintiff has proven that Defendants alleged reason for that denial was pretextual.  Plaintiff has thus established a prima facie case of disparate treatment.  See Mitchell, 964 F. 2d at 583.

K.      Defendants also treated Plaintiff differently than similarly-situated white employees with respect to complaints allegedly made against him.  Students in one of Rick Schneiders classes circulated a petition against him and presented it to the administration.  Three (3) out of four (4) students in another of his classes complained to the administration about him.  Mr. Schneider was permitted to meet with some of the parents and attempt to resolve the situation.  Mr. Schneider was never given an ultimatum of accepting a mentor or resigning.  In fact, the assignment of a mentor or tendering his resignation was never even mentioned.

L.      To establish a prima facie case of retaliation, a plaintiff must demonstrate that:  1) he engaged in protected activity;  2) his exercise of his civil rights was known to the defendants; 3) the defendants took action adverse to him;  and 4)  there was a causal connection between the protected activity and the adverse employment action.  EEOC v. Avery Dennison Corp., 104 F.3d 858, 860 (6th Cir. 1997)

X.      The Equal Protection clause of the Fourteenth Amendment to the Constitution of the United States and 42 U.S.C.  1981 are both clearly intended to prevent discrimination on the

basis of race. 42 U.S.C. 1981 specifically prohibits racial discrimination in the making and enforcement of contracts. Section 1981 applies to all phases and incidents of the contractual relationship. Rivers v. Roadway Express, Inc., 511 U.S. 298, 302, 114 S. Ct. 1510, 128 L. Ed. 2d 274 (1994).

Y.    Defendants intentionally infringed upon Plaintiffs equal protection rights as well as his rights guaranteed by 42 U.S.C. 1981. Refusing to compensate Plaintiff as the two Caucasian teachers were compensated constituted discrimination in the making or enforcement of a contract. And Defendants disparate treatment of Plaintiff denied him his Fourteenth Amendment right to equal protection of the law.

Z.    Municipalities and other bodies of local government are persons within the meaning of 42 U.S.C. 1983. Adkins, 982 F. 2d at 957. Though respondeat superior does not apply in Section 1983 actions, a governing board may be liable if it "caused a constitutional tort through a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that bodys officers." City of St. Louis v. Praprotnik, 485 U.S. 112, 121, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988), quoting Monell v. New York City Dept. of Social Serv., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A formally adopted policy is not required; established custom or usage may be sufficient. Id.

AA.    Ratification of a subordinates decision creates liability on the part of a governing board. Meyers v. Cincinnati, 14 F.3d 1115, 1117 (6th Cir. 1994); Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Educ., 926 F.2d 505, 516 (6th Cir. 1991). When a subordinates decision is subject to review by the municipalitys authorized policymakers, they have retained the authority to measure the officials conduct for conformance with their policies. If the

authorized policymakers approve a subordinates decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final. Meyers, 14 F.3d at 1118.

BB.    "The requirement that a municipalitys wrongful actions be a policy is not meant to distinguish isolated incidents from general rules of conduct promulgated by city officials. [I]t is plain that municipal liability may be imposed for a single decision by municipal policy-makers under appropriate circumstances." Id. at 1117.

CC.    Ohio Revised Code  3319.08 states, in pertinent part:

> The board of each school district or service center that authorizes compensation in addition to the base salary stated in the teachers salary schedule for the performance of duties by a teacher that are in addition to the teachers regular teaching duties, shall enter into a supplemental contract with each teacher who is to perform additional duties.

DD.    Pursuant to Ohio Revised Code  3319.08, Madeira City School District Board of Education ("the Board") was required to enter into supplemental contracts with Kay Fluharty and Rick Schneider in order to authorize additional compensation to them for assisting with Meredith Masseys classes when he resigned.

EE.    In choosing to pay the Caucasian teachers and to deny payment to Plaintiff, Defendants discriminated against Plaintiff on the basis of his race and, specifically, in the making of a contract, in violation of 42 U.S.C.  1981. The Board ratified the constitutionally impermissible decision by Defendant Hummel that the white teachers would be paid and the black teacher would not. See Praprotnik, 485 U.S. at 121. They therefore approved Hummels

27

decision and the basis for it, and their ratification is chargeable to the Board because their decision is final. See Meyers, 14 F.3d at 1118.

FF.    Government officials are only entitled to qualified immunity when performing discretionary functions if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1981). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

GG.    In deciding whether a defendant is entitled to qualified immunity, a court must first determine whether a constitutional violation occurred. Centanni v. Eight Unknown Officers, 15 F.3d 587, 589 (6th Cir. 1994). The court then utilizes an objective reasonableness standard to determine whether a government official would think that the right was clearly established. The court examines whether, given the facts that the official knew or should have known at the time, the official should have known that his "conduct would not pass scrutiny when applied to the law." Long v. Norris, 929 F. 2d 1111, 1115 (6th Cir. 1991).

HH.    Each case must be analyzed on a fact-specific, case-by-case basis. Jones v. Youngstown, 980 F. Supp. 908, 913 (N.D. Ohio 1997). An officials subjective good faith is a question of fact;  and questions of a defendants intent may likewise rarely be decided by summary judgment. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1981). "Negligence as to the existence of harassment can be serious enough to constitute an intentional act of discrimination." Blankenship, 123 F.3d at 873.

II.    Defendants violated Plaintiffs constitutional rights, and those rights were clearly established.  See Moore, 171 F.3d 1073;  See  Blankenship, 123 F.3d 868;  See Hafford, 183 F.3d 506;  See Mitchell, 964 F. 2d 577;  See EEOC, 104 F.3d 858;  , 104 F.3d 858;  See Perry, 408 U.S. 593;  See Paprotnik, 485 U.S. 112;  See Monell, 436 U.S. 658; See Pickering, 391 U.S. 563;  See Hardy, 260 F.3d 671;  See Bonnell v. Lorenzo, 241 F.3d 800 (6th Cir. 2001);  See Parate v. Isibor, 868 F. 2d 821 (6th Cir. 1989).

JJ.    Reasonably competent educators and administrators, such as Defendants, are surely aware of teachers rights to equal protection of the law.  Blatantly discriminating against Plaintiff with regard to payment for the extra class, and denying Plaintiff an opportunity to confront his accusers or at least obtain knowledge of the nature of the complaints against him so that he might adequately respond were all instances for which a reasonable person would understand that they were violating Plaintiffs rights.  See Anderson v. Creighton, 483 U.S. at 640.

KK.    Given the facts that Defendants knew or should have known, they should surely have contemplated that their "conduct would not pass scrutiny when applied to the law."  See Long, 929 F. 2d at 1115.  Defendants were, at the very least, negligent as to the existence of harassment; and that negligence was serious enough to constitute an intentional act of discrimination.   See Blankenship, 123 F.3d at 873.  Defendants thus "violated a clearly established statutory or constitutional right of which a reasonable person would have known" and are therefore not entitled to qualified immunity. See Harlow, 457 U.S. at 818.

LL.    Intentional infliction of emotional distress requires extreme and outrageous conduct that intentionally or recklessly causes serious emotional distress.  Yeager v. Local Union

29

20 (1983), 6 Ohio St. 3d 369, Syll. ¶ . Mental anguish must be of a nature that no reasonable person could endure. Osman v. Isotec, 960 F. Supp. 118, 122 (S.D. Ohio 1997).

MM.  Defendants decision to humiliate and ostracize Plaintiff with regard to the "douche/tampon" incident, the subsequent lowered evaluation ratings and, ultimately, the issuance of the ultimatum was intended to cause him such severe emotional distress that he would leave. Plaintiff has suffered serious mental anguish that no reasonable person could be expected to endure, and that anguish was caused by the extreme and outrageous conduct of Defendants. See Osman, 960 F. Supp. at 122; See Yeager, 6 Ohio St. 3d at Syll.

NN.  There is inarguably a strong public policy against discrimination in employment and abrogation of First Amendment rights. Plaintiff has established a prima facie case of discrimination by Defendants based on his race, and he has demonstrated that Defendants violated his First Amendment right to free speech and academic freedom. He has, thus, also established a violation of public policy.

**Defendants Issues of Law:**

1)  Plaintiff did not meet the test of an adverse employment action. He was not terminated, demoted, reduced in salary or benefits, or diminished in title or responsibility. He was merely counseled in response to parental and student complaints, and offered the assistance of a mentor. While the alternative to acceptance of the mentor was a request for his resignation at the end of the school year, he was clearly advised that the defendants wished that he would accept the mentor, and hoped for his ultimate success as a teacher. *Allen v. Michigan Department of Corrections,* 165 F.3d. 405 (6th Cir. 1999); *Hollins v. Atlantic Co.,* 188 F.3d. 652 (6th Cir. 1999);

*Kocsis v. Multi-Care Management, Inc., supra*; *Jones v. Metropolitan Housing Authority,* 2002 U.S. App. LEXIS 13358 (6th Cir. July 2, 2002), unreported decision.

2)    Even had there been adverse employment actions, plaintiff has not shown that "similarly situated" white employees were treated differently.

3)    To be found "similarly situated," the individuals with whom the plaintiff seeks to compare his treatment must have had the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differing or mitigating circumstances that would distinguish their conduct or the employers treatment of them for it. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d. 344 (6th Cir. 1997).

4)    There is no evidence that while employees were treated differently than plaintiff. At least two white teachers who have experienced classroom management problems where also assigned mentors. One of those teachers accepted his mentor and became a successful teacher. The other refused mentoring and resigned.

5)    Here, plaintiff has not alleged or shown that his supervisors subjected him to harassing conduct. Thus, defendants can only be liable if plaintiff shows that they knew or should have known of harassment by plaintiffs co-workers or students, but failed to implement prompt or appropriate corrective action. The corrective action taken by an employer is appropriate so long as it does not manifest "indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship v. Parke Care Centers, Inc.,* 123 F. 3d. 868 (6th Cir. 1997). Mere negligence as to the content of the response is not enough to make an employer liable. *Id.* at 873. Plaintiff failed to show that defendants did not comply with this standard.

6)    The corrective action taken by defendants did not manifest "indifference or unreasonableness in light of the facts the employer knew." *Blankenship v. Parke Care Centers, Inc., supra.* Nor does it demonstrate that the defendants "condoned severe or pervasive racial harassment." *Smith v. Leggett Wire Company, supra.* Indeed, they demonstrate precisely the opposite.  Moreover, Cadets conduct was very similar to that demonstrated by plaintiff in *Sweezer v. Michigan Department of Correction,* 2000 U.S. App. LEXIS 21251 (6th Cir. August 11, 2000) [unreported].  In *Sweezer,* the plaintiff also failed to cooperate in the investigation of her complaints.  Further, like Cadet, Sweezer failed to notify her employer of many of the "harassing incidents."  As noted by the Sixth Circuit:  "Absent knowledge of the conduct, defendants cannot be liable for co-worker harassment." *Id* at 18.

7)    With regard to plaintiffs alleged reporting of the comments of Kalgreen, Kuykandall and Schuck, the *Sweezer* opinion is also instructive.  There, the court found that Sweezers case consisted mainly of "a conglomeration of incidents which are racially neutral." *Id.* at 14.  The court went on to point out that a racial nexus was missing from Sweezers allegations and the conduct of her co-workers, however rude or impolite they might have been.  Additionally, even with respect to a few overtly racial remarks, such as "colored woman" and "nigger," the court found that such comments were brief and isolated and more indicative of a personality conflict than racial animus. *Id.* 15-16. *See, Crawford v. Medina Gen. Hosp.,* 96 F.3d. 830, 836 (6th Cir. 1996).  The same can be said here.

8)    Further, by his failure to issue timely written disciplinary referrals as required by Board policy, Cadet deprived the administration of its ability to act on his complaints.  Despite plaintiffs belief that his bare accusation of misconduct was sufficient to warrant discipline of a student, the law is otherwise.  Students are entitled to due process of law and the presentation of

32

proof against them. Plaintiffs dilatory reporting of alleged misconduct rendered it impossible for defendants to take further remedial action.

9)    There is no proof, direct or indirect, that defendants tolerated or condoned racial harassment. Further, what plaintiff reported to the defendants was not severe and pervasive racial harassment, but the type isolated, disrespectful comments that are occasionally uttered by immature junior-high or high school students. As the Supreme Court has often stated, Title VII (and by extension, 42 U.S.C. 1981, 42 U.S.C. 1983 and O.R.C. Chapter 4112) is not a general civility code. *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998):

". . simple teasing, offhand comments and isolated incidents (unless extremely serious)
will not amount to discriminatory changes in the terms and conditions of employment."
*Id.* at 788."

42 U.S.C. 1983 does not itself create any constitutional rights. Rather, it provides a federal cause of action for the vindication of constitutional guarantees found elsewhere. *Braley v. City of Pontiac,* 906 F.2d. 220 (6th Cir. 1990). Thus, in order to succeed on a 1983 claim, the plaintiff must first prove that the defendant deprived him of a right secured by the Constitution or laws of the United States. *Adickes v. Kress,* 398 U.S. 144 (1970). Second, the plaintiff must show that he was deprived of this right under color of law. *Id.; Searcy v. City of Dayton,* 38 F.3d. 282 (6th Cir. 1994). However, the threshold inquiry is whether a constitutional or statutory violation occurred at all. *Siegert v. Gilley,* 500 U.S. 226 (1991); *Silver v. Franklin Township Board of Zoning Appeals,* 966 F.2d. 1031 (6th Cir. 1992). Plaintiff cannot establish this element with respect to any federal claim.

10)    As a political subdivision, the Board may be held liable under 1983 only for official

policies or customs. *City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988). Pursuant to the rule of

*Pembauer v. Cincinnati,* 475 U.S. 469 (1986) an "official policy" is one adopted by someone

"with final authority to establish municipal policy with respect to the action ordered." *Id.* at 481.

"Only those municipal officials who have 'final policy making authority may by their actions

subject the government to 1983 liability." *Praprotnik, supra,* at 123. The question of final

policy-making authority is one of state law. Section 3319.11 of the Ohio Revised Code states

that a board of education has this final authority. *Justus v. Brown,* 42 Ohio St.2d. 53, 325

N.E.2d. 884 (1975). Thus, even if plaintiff could produce evidence of the existence of unlawful

conduct by individual employees at Madeira (which he cannot), the Board herein is not liable to

plaintiff under 1983 unless he can prove the existence of unconstitutional actions by the Board,

itself. *Hull v. Cuyahoga Valley Joint Vocational School District Board of Education,* 926

F.2d.505 (6th Cir. 1991).

11)    Thus, even if plaintiff could prove that Hummel, Mate or Imhoff treated him in an

unconstitutional manner, their tainted actions cannot be transformed into a decision by the

Board. In order to vest liability upon the Board herein, plaintiff must prove that at least three

members of the five-member Board acted unconstitutionally towards plaintiff. There is no such

evidence.


12)    Section 1981 prohibits racial discrimination in the making and enforcement of contracts.

*Rivers v. Roadway Express, Inc.,* 511 U.S. 208, 301 (1994). Prior to the 1991 amendments to 42

U.S.C. 1981, the Supreme Court held that 1983 was the exclusive remedy for violation of the

rights contained in 1981, and required that a claimant prove an injurious policy or custom as

34

under 1983. *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701 (1989). The status of the first part of this rule is now the subject of dispute among the circuit courts which have addressed it. However, the policy or custom rule , and its rejection of *respondeat superior*, remains the law of every circuit which has considered it. *Evans v. City of Houston,* 246 F.3d. 344, 357-358 (5th Cir. 2001); *Butts v. Volusia,* 222 F.3d. 891, 894 (11th Cir. 2000); *Smith v. Chicago Sch. Reform Bd. of Trustees,* 165 F.3d. 1142, 1148 (7th Cir. 1999); *Artis v. Francis Howell N. Band Booster Assn.,* 161 F.3d. 1178, 1181 (8th Cir.1998); *Federation of African-American Contractors v. City of Oakland,* 96 F.3d. 1204, 1214-1215 (9th Cir. 1996); *Dennis v. County of Fairfax,* 55 F.3d. 151, 155 (4th Cir. 1995). The Sixth Circuit has not directly addressed this issue. However, Judge Marbley has accepted the continued viability of this rule in *Noble v. Brinker International, Inc.,* 175 F. Supp.2d. 1027 (2001). We accept the correctness of J. Marbleys reasoning. Given that plaintiff cannot prove that he was harmed by any policy or custom of the Board, his 1981 claim must fail.        The undisputed facts clearly demonstrate that neither Hummel, Mate nor Imhoff discriminated against plaintiff in any fashion. They took no adverse employment action against plaintiff, and promptly and adequately investigated his harassment complaints. There is no evidence that they were motivated by any discriminatory intent. For purposes of 1983 and 1981, their actions were objectively reasonable and entitle them to the protection of qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800 (1982); *Anderson v. Creighton,* 483 U.S. 635 (1987). Likewise, under 1981, there is simply no evidence that they engaged in "purposeful discrimination." *General Building Contractors Assoc., Inc. v. Pennsylvania,* 458 U.S. 375 (1982); *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d. 370 (6th Cir. 1984).

13)    Under U.S.C. 1983, the first step in analyzing a due process claim under the Fourteenth Amendment is to determine whether a constitutional violation occurred, at al. *Seigert v. Gilley, supra*. Plaintiff cannot survive this analysis. First and foremost, plaintiff suffered no injury caused by the defendants. He was not terminated, disciplined, demoted or otherwise adversely affected in any legally cognizable manner. He resigned voluntarily, rather than accept guidance and criticism from his employer. While he may have been offended or insulted by the criticism and suggestions for improvement, since he believed he had no weaknesses, his interest in an unbruised ego is not within the Fourteenth Amendments protection of liberty and property.

14)    Second, even if plaintiff had suffered an adverse action, no property or liberty interest would have been infringed. Property interests protected by the Due Process Clause must be more than abstract desires or attractions to a benefit. The Due Process Clause protects only those interests to which one has a "legitimate claim of entitlement" under state law. *Roth v. Board of Regents,* 408 U.S. 564, 577 (1972); *Arnett v. Myers,* 281 F.3d. 552 (6th Cir. 2002). Under Ohio law, a public school teacher under a limited contract, such as plaintiff, has no claim of entitlement to his position. O.R.C. 3319.08. It is only when a teacher obtains a continuing contract (i.e., tenure) that such an entitlement exists. O.R.C. 3319.08 and 3319.11. As the Sixth Circuit has noted, the deprivation of a finite interest in employment does not support a 1983 action, since it can be compensated adequately by an ordinary breach of contract action. *Sharp v. Lindsey,* 285 F.3d. 479, 489 (6th Cir. 2002); *Ramsey v. Board of Education,* 884 F.2d. 1268 (6th Cir. 1988). Of course, the only breach of plaintiffs contract was by plaintiff.

15)    Injury to reputation, by itself, is not a "liberty" interest protected under the Fourteenth Amendment. *Seigert v. Gilley, supra; Paul v. Davis,* 424 U.S. 693 (1976). Even defamation, alone, is not a constitutional deprivation.

> "Where a plaintiff alleges deprivation of liberty because he was defamed in the course of his employment, to be actionable under the Fourteenth Amendment the defamation must occur in the course of the termination of employment."

16)    *Id.* at 710; *Thompson v. Scheid,* 997 F.2d. 1017 (6th Cir. 1992). Here, plaintiff has not alleged or proved any defamatory statements. His claim to reputation injury is that he was criticized and offered a mentor to help him improve. Putting aside that hurt feelings do not equal a legal injury, and that these comments were privileged under Ohio law, *Hahn v. Kotten* (1975), 43 Ohio St.2d. 237, 331 N.E.2d. 713, it cannot be said that defendants statements or conduct "affected the termination of plaintiffs employment." *Thompson v. Scheid, supra* at 1020. Plaintiff resigned.

17)    Although it is not entirely clear what "common law" plaintiff intends to invoke in Count IX of the Amended Complaint, presumably this is a "public policy tort" claim brought under *Greeley v. Miami Valley Maintenance Constrs., Inc.* (1990), 49 Ohio St.3d. 228, 551 N.E.2d. 981 and its progeny. This claim must fail. When a public policy claim is embodied in an underlying statute, the Ohio Supreme Court has held that the plaintiff must be able to bring a claim under the underlying statute in order to bring a separate but parallel public policy tort claim. *Contreras v. Ferro Corp.* (1995), 73 Ohio St.3d. 224, 652 N.E.2d. 940. Obviously, this is the case here. O.R.C. Chapter 4112, 42 U.S.C. 1981 and 42 U.S.C. 1983 provide prohibitions against, and remedies for, racial discrimination.  Since plaintiff has not been the victim of racial

discrimination, the is entitled to no relief under those statues.  Consequently, plaintiffs public policy claim must also fail.

18)    For the Court to rule otherwise would mean that a plaintiff could avoid the statutory requirements and definitions merely by asserting a companion "public policy" discrimination claim.  This would unwisely undermine the statutory provisions and eliminate the boundaries established by Congress and the Ohio General Assembly when the existing statutes were enacted.

19)    Additionally, the public policy tort theory provides that no avenue of recovery for plaintiffs claims.  The cause of action for a public policy tort is confined to claims of discharge or discipline.  *Kulch v. Structural Fibers, Inc.* (1987), 78 Ohio St.3d. 134, 677 N.E.2d. 308; *Bell v. Cuyahoga Community College,* 129 Ohio App.3d. 461, 717 N.E.2d. 1189 (Cuyaghoga App. 1998).  Since plaintiff was neither discharged nor disciplined, he cannot raise this claim.

20)    None of the defendants is liable to plaintiff under a theory of intentional infliction of serious emotional distress.  "One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Yeager v. Local Union 20* (1983), 6 Ohio St.3d. 369, Syllabus.  The Ohio Supreme Court defines "serious emotional distress" as "emotional injury which is both severe and debilitating." *Osman v. Isotec,* 960 F.Supp 118, 122 (S.D. Ohio 1997).  "The mental anguish suffered must be of such a nature that no reasonable person could endure it." *Id.*  There is simply no evidence that plaintiff ever suffered the requisite serious emotional harm to sustain his cause of action.  Cadet testified that he is depressed.  However, he still participates in usual social and recreational activities, he goes out with his family, he has not been incapacitated, he has been employed teaching at the

38

University of Cincinnati, he substitutes at Sycamore High School, he lectures at universities throughout the United States, and he is writing a book.

21)    Further, he had no psychiatric care between February 2000 and December 2001, when, at the suggestion of his attorney, (and two weeks before his deposition) he began seeing a psychiatrist.  Prior to that, he had seen his family doctor one time in December 2000, and received some medications for depression, which he took for "approximately a month."  Plaintiff has presented no evidence of a serious mental distress.  Without evidence of serious emotional distress, his claim must fail. *Yeager, supra* at 374.

22)    Moreover, there is no evidence of extreme or outrageous conduct on the part of any of the defendants.  To be actionable, defendants conduct must be considered "to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 375.  There is no evidence of this sort.

### 6.    WITNESSES:

Plaintiff will call or will have available for testimony at trial those witnesses listed on Appendix B hereof.

Defendant will call or will have available for testimony at trial those witnesses listed on Appendix C hereof.

The Plaintiff reserves the right to call nonlisted rebuttal witnesses whose testimony could not reasonably be anticipated without prior notice to opposing counsel.

### 7.    EXPERT WITNESSES:

The parties propose to call the following number of witnesses, all of whom have been disclosed to the opposing side:

Plaintiff will call Phillip K. Way, Ph.D.

Defendants will not be calling any expert witnesses.

**8.    EXHIBITS:**

The parties will offer as exhibits those items listed herein as follows:

Joint Exhibits: Appendix E

Plaintiff Exhibits: Appendix F

Defendant Exhibits: Appendix G

**9.    DEPOSITIONS :**

The Defendants anticipate that some witnesses testimony will be presented by deposition and/or videotape.

**10.    DISCOVERY:**

Discovery has been completed.


**11.    PENDING MOTIONS:**

The Plaintiff has filed a *Motion in limine* which is still pending at this time.

The Defendants anticipate filing a motion *in limine* prior to trial.

**12.    MISCELLANEOUS ORDERS:**

There are no miscellaneous court orders.

**V.    MODIFICATION**

This Final Pretrial Order may be modified at the trial of this action, or prior thereto, to prevent manifest injustice.  Such modification may be made by application of counsel, or on motion of the Court.

VI.    **SETTLEMENT EFFORTS**

No settlement demands or offers have been exchanged.

VII.    **PROPOSED INSTRUCTION - TRIAL TO A JURY**

Pursuant to Section IV of this trial packet, Jury Instructions are to be submitted seven (7)

days prior to trial.


9/8/03
DATE                              TIMOTHY S. HOGAN, U.S. MAGISTRATE JUDGE

9-3-03
DATE                              COUNSEL FOR PLAINTIFF

9-3-03
DATE                              COUNSEL FOR DEFENDANT

                                  Pursuant to Authorization

Joint Pretrial Order2.RSF.wpd-wlh

41

## APPENDIX B
## Plaintiff's Witnesses

Jean-Robert Cadet
7258 Longfield Drive
Cincinnati, Ohio   45243

Cynthia N. Cadet
7258 Longfield Drive
Cincinnati, Ohio   45243

Kay Fluharty
22 Ritchie Avenue
Wyoming, Ohio   45215

Richard Schneider
6288 Branch Hill-Miamiville Road
Loveland, Ohio  45111

Caldwell Wright
11743 Elkwood Drive
Forest Park, Ohio   45240

Paul Deardorf, Ph.D.
1019 Delta Avenue
Cincinnati, Ohio   45208

Philip K. Way, Ph.D.
Director, University Honors
Scholars Program Associate
Professor, Economics 515
Dabney Hall
Cincinnati, Ohio   45221

Michele W. Hummel(as on cross)
14 Camargo Canyon
Cincinnati, Ohio 45243

Christopher J. Mate(as on cross)
Madeira City School District
7465 Loannes Drive
Cincinnati, Ohio   45243

Paul W. Imhoff(as on cross)
Madeira City School District
7465 Loannes Drive
Cincinnati, Ohio   45243

Martin Strifler(as on cross)
1163 Eagle Ridge
Milford, Ohio   45150

Ruth Corgan
6525 Madeira Hills Drive
Madeira, Ohio   45243

Anita and Joe Grolmes
8009 Sanoma Drive
Madeira, Ohio   45243

Joseph P. O'Leary
6262 Lakota Drive
Madeira, Ohio   45243

Michael Ramos
7615 Miami Avenue
Cincinnati, Ohio   45243

Megan Vink
6847 Meadowdale Circle
Madeira, Ohio   45243

Tom and Sally Cuni
6237 Lakota Drive
Madeira, Ohio   45243

**APPENDIX C**

**<u>DEFENDANTS' WITNESSES</u>**

NAME                          ADDRESS

John-Robert Cadet

Dr. Michele Hummel

Chris Mate

Paul Imhoff

Barbara Brewer

Steve Kramer

Rick Schneider

Kay Fluharty

Cindy Cadet

Emily Andrews

Clare Stork

Susan Johnston

Jamie Beyersdorfer

Niki Basile

Christopher Wallace

Allison Shaw

Elizabeth Vaccari

Piyush Swami

## APPENDIX F
## Plaintiff's Exhibits

1.   Copy of Ohio teaching certificate for Jean Cadet, dated March 17, 1998

2.   Salary Notice for Jean Cadet for 1999-2000 school year

3.   Quest book

4.   Quest curriculum manual

5.   Student results by level and division (for French competition)

6.   Performance Evaluation of Jean Cadet, dated January 1997

7.   Performance Evaluation of Jean Cadet, dated December 1997 and January 1998

8.   Performance Evaluation of Jean Cadet, dated April 1 and 20, 1998

9.   Performance Evaluation of Jean Cadet, dated October and December 1998 and January 1999

10.  Performance Evaluation of Jean Cadet, dated March and April 1999

11.  Performance Evaluation of Jean Cadet, dated December 1999 and January 2000

12.  Memorandum from Imhoff dated February 18, 2000

13.  Supplemental Contract for Kay Fluharty

14.  Supplemental Contract for Richard Schneider

15.  Madeira Board of Education Administrative Regulations, Implementing Board Policy: Harassment (4/6/92)

16.  Madeira Board of Education Administrative Regulations, Implementing Board Policy: Harassment (11/15/99)

17.  Letter from Ruth Corgan to Pat Gentile, dated March 8, 2000

18.  Letter from Ruth Corgan to Pat Gentile, with fax date of April 7, 2000

19.  E-mail from Anita and Joe Grolmes to Michele Hummel, dated April 4, 2000

20. Letter from Joseph P. O'Leary to Michele Hummel, dated March 4, 2000

21. Letter from Michael Ramos to Jean Cadet with copy to Michele Hummel, dated March 8, 2000

22. Letter from Megan Vink to Mr. Kramer, dated March 1, 2000

23. Letter from Thomas L. and Sally W. Cuni to Christopher Mate, dated February 29, 2000

24. Discipline History Report of Jean Cadet for 1998-99 school year

25. Discipline History Report of Jean Cadet for 1999-2000 school year

26. Individual Student Report of Nick Schuck for 1998-99 school year

27. Individual Student Report of Scott Kuykendall for 1998-99 school year

28. Individual Student Report of Ben Kallgren for 1998-99 school year

29. Resume of Philip K. Way, Ph.D.

30. Report of Philip K. Way, Ph.D.